I am informed that all parties are here, so I will call the first case on our calendar, which has heard three cases in tandem, Jacqueline Fisher v. Aetna. Counsel, you may proceed. Thank you, Your Honor. My name is Bill Dunigan for the appellants in each of these three cases, and I will begin my argument with Appeal No. 2031-48, which involves the issue, what are the terms of one of these insurance contracts? Now, the analysis in this appeal should begin and end with one statute, Section 3204 of the New York State Insurance Law. And to cut to the chase, what the district judge did was to interpret a section or to subsection dealing with a schedule of rates filed with the state. Now, back to the beginning. Section 3204-A provides, and this is on page 26 of our main brief, and I'm putting some ellipses in. Every policy of health insurance shall contain the entire contract between the parties, and nothing therein shall be incorporated by reference. Now, the purpose of this section of the insurance law is to make sure that consumers have the entire contract, the entire set of obligations that the insurance company is committing to. But, counsel, isn't it unreasonable to think that the January 9th filing was the complete policy? Well, I think it was, Your Honor, because there was... You think it was reasonable? Absolutely. Absolutely. But it didn't have the rates. I'm sorry, Your Honor? It didn't have the rates. The rates. R-A-T-E-S. R-A-G-E-S. The rates. It didn't have the insurance. The rates. It did have... The January 9th contract did have the rates in it for each individual who was part of the policy. Don't we have a fundamental problem here that the relationship between the first short thing that was filed and the 100-page-plus contract is what we're talking about. And New York law says, as you just said, that there should be only one document. On the other hand, there are lots of cases, mainly court of appeals cases, in situations involving online things where we say, well, that's enough for inquiry notice and so on. Now, those aren't New York cases and they deal with things which are online as against this one. So, isn't the answer that we just don't know what New York wants about this and we should certify? You know, we should just send this issue, the relationship between these two, to the New York Court of Appeals. It's a possibility, Your Honor, but I think it's within the precedent of this court to decide this issue at this time. The Smith case, for example, did say that the purpose of 3204 was to allow the consumer at the time... I understand that. And I understand why one might say that there has to be only one contract and that the first one was not filed and that it wasn't, therefore, just a rates agreement because everybody has conceded that it was more than that. And there's lots of filings, lots of sites by the other side about binders, but it's hard to say that this was a binder when it really knows how seriously New York takes this single document filing in a situation between two sophisticated parties, and Lord knows you are more than sophisticated in this, and whether in a situation like this they would say you are sufficiently on inquiry notice anyway. And it's a matter of New York law. Well, Your Honor, I completely agree with you that it's a matter of New York law, but what you're suggesting is we don't have enough precedent or the plain language of the statute is not sufficiently clear. Yeah, I don't think we know because the district court, no darn good judge, was looking at what we have done in fact in other cases that are similar to this and did what district judges who can't certify did the best he could in one direction. You're telling us we should go in the other direction, and maybe that's correct, but shouldn't we first in any event just say to New York, if you want to tell us what to do, we'll do it. If they don't, then we'll come back and deal and do the best we can. Your Honor, that's a possible result. No one has suggested that before today, but if that's what the court wants to do. People rarely do, and when they come before me, I usually do. Okay. But let me suggest... Why don't you continue? Okay. What I did want to suggest is that reading the statute the way the district court did, I think is incorrect as a January 19th document. The parties agree that that was a contract. No question about that. The statute says all the terms have to be set forth in that document unless it is a, quote, schedule of, unless you incorporate by reference a schedule of rates on file with the State. There's two problems with that. One, everyone agrees that the January 9th document, what the district court called the schedule of rates, was not on file with the State. The party stipulated that that was not given to the Department of Financial Services. The second part of this is, is that when you read the statute, the schedule of rates must be distinct from the contract. If you read B, it says, subsection A shall not apply to a table or use in connection with such policy or contract. So there are two different documents that subsection B concerns. One is the schedule of rates on file with the State, which we don't have here, and the other is the contract, which is the January 9th document, which everyone agrees was the contract. Well, forget about it. The contract. Can I ask you, there's another section of New York law, which the district court cited in her adversary's cites, 3201B1, that no policy form, which has got a broad definition, shall be delivered or issued for delivery in this state unless it has been filed with and approved by the superintendent that's conforming to the requirements of this chapter and not inconsistent with the law. Was this document, this January document, which you claim is the final insurance contract, did that comply with 3201B1? Was that ever delivered or issued for delivery unless it had been filed with and approved by the superintendent? No, Your Honor. There's no question about that. So this is essentially, if you say this is an, it's not a valid one. Well, no, I don't think that's correct, Your Honor, in this situation. It may be invalid if the insurance company is trying to enforce it in other circumstances or the like. Yes, but the argument that is being made is that maybe New York would treat this as a nullity because it wasn't sent in and therefore the only document is the last one. You are telling us that there are both of them and therefore they both have to be, that one thing has to be filed. But as Judge Horman has said, if New York, because of this section, treats the first one as essentially a nullity, then only one thing was filed. The problem with that analysis, Your Honor, is that it's not a question of just two pieces of paper. It's a situation where everyone agrees that the first document executed on January 9th was an enforceable contract. Even though New York says it can't be because it hasn't been filed. Yes, but Your Honor, we have cited in our briefs, and I'm going to try to pull a citation up for you now, which is that an insurance company can't void its own obligation by saying that it did not comply with the insurance statute. I understand that. I'd like to switch topics, if I can. Your time has almost expired. Your Honor, I cannot give you an apology. Can you hear me now? I'd like to switch topics, okay? So I'd like to ask about your need for a judgment. You keep telling us you want a judgment, understandably, to get class certification, but you already have the judgment from 2014 for $180. Why isn't that sufficient? Well, Your Honor, we're dealing with two different policy years, and we would like a judgment from the 2015 policy year so that we can include within the class all of the people that have not received their benefits for that policy year. If we don't have a judgment for that policy year... I understand that, but you have one for 2014. Right, and the class that would be certified out of 2014 would simply be the people who had the 2014 policy. I don't believe we would be allowed to extend that to people who had their 2015 policy. Unless it's identical. Unless it's an identical policy. They would be very, very similar, but I think the fact that one was a separate case, and we would have lost the case for the year 2015, would probably end the analysis in the district judge's mind about whether we could proceed with class members who had the 2015 policy. Both judges that you came before seem a little surprised, if not skeptical, of all this litigation. Is that true? I think Judge Woods said something about it was hard to understand all this litigation because of that. Well, it seemed to us from the outset that we were not the only people who were deprived of what we thought our contractual rights were, or our ERISA rights were. I told Judge Woods at the trial... What you thought is a separate question from when you claim the final rate sheet, for example, is an enforceable contract. It seems to me that you understood, and I think Judge Woods indicated that, that this was not the final contract, and that you were at least under some inquiry notice, particularly because I myself, as I read the final rates, do not understand the portion that deals with prescription drugs. In fact, it doesn't say whether the drug that the plaintiff was taking was a formulary, for example. Well, I think it's stipulated it was on the formulary, Your Honor. Pardon me? I believe it was stipulated that that drug effects for XR was on the formulary. I believe it was stipulated after the fact, but I'm looking at what you would be looking at when you got this document. I believe the formulary was available over the internet at the time, so that was out there. The problem with attempting to... I understand this. It's fairly complicated. The formulary also provided for this step-up process on the choose generic. No, I don't think that's right, Your Honor. The formulary is simply a list of drugs which are covered. The step-up process is only set forth in the February 19th document. It is not otherwise online. I myself, as a layman, do not understand what any of that implies. First of all, what the drug she was taking was a formulary, and what the consequence was in terms of this choose generic clause was. Was it a formulary? Was there a difference between compensation if you took it to a pharmacy that was approved by Aetna or not approved by Aetna? I don't know what the meaning of in and out was. It just seems to me that the notion that he believed, he meaning Mr. Dunnigan who is not your client, is not the plaintiff rather, that this New York State silver policy was something out of Obamacare is preposterous. Well, everyone agrees that that was a contract. I think what this was realistically, whatever name people are attaching to it, was a summary essentially of the major points of the contract, this blue, this New York silver contract, which would take effect and had taken effect on is correct. What that means is they hand me a piece of paper, which is a summary, which does not contain what they say are all the material terms. I sign it. I commit my law firm to pay all of these premiums over the coming year. Then, without any reference in that document or any reference anywhere else to a 100-plus page document, they send me this 100-page document six weeks later and say, this is your contract. Well, apparently this is not an uncommon practice of sending the actual document contract somewhat later than the effective date of the contract. At least by January, I think 29th, the indication is that you knew the terms of the contract because the doctor, when the first prescription was turned down, provided a form that he thought complied with Aetna's requirements. No. The chronology there, Your Honor, was we signed the contract on the 9th. The plaintiff goes to fill the prescription on the 29th of January. The pharmacy says, hang on, we get the insurance company. The insurance company sends the form to the doctor. The doctor completes the form that was faxed to the doctor, sends it back to Aetna, and Aetna says, we agree to cover the drug. Look, I think your best argument is that while, in fact, you knew exactly what was going on and that what Judge Corman has said, and that in your case, you know, the whole thing is absurd. You knew what was going on. You knew that. But your argument is, if we rule as the district court, we are also permitting insurance companies to do this with respect to people who aren't as knowledgeable as you are, and that therefore, there is a problem. But don't tell us that this, that, or the other thing of it you didn't know, because it's perfectly clear in this that you knew everything that was happening, and you knew that the first one wasn't the one, and the second one, which is what the district judge practically said to us. Well, did the doctor, when he got this form faxed to him, say that the effectsor was medically necessary? It did, Your Honor. There was a form at the bottom where he said the above prescription, the above drug is medically necessary for this patient. He signed it, and above was, in a box, effectsor XR, capital letters, brand. Yes, but he, as my recollection is correct, he said she had tried three other kinds, not the equivalent, but three of them, Prozac and two other kinds of antidepressants, which didn't work. But he didn't say that she had tried the generic brand of, what is it, effectsor or flexor. Which is what the policy required. Yes, he did not say that she had tried the generic brand. Right, and what that did, what that gave her, in effect, was the right to still purchase from stores, from drugstores and pharmacies that had agreements with she had gone to one that didn't, or she had just gone to even that one. That's what that gave her. I think it gave her more than that, Your Honor, because it said in the form that they sent to the doctor, we accept your request, we agree with you, we will cover the effectsor XR. When they say they are covering it, that has certain implication. It means they're applying it toward the deductible and that it should count toward the out-of-pocket limit under the statute. I don't want to get involved. I think they did apply it to the deductible. They did. They did, which means they covered it. In one of the briefs, I believe it was your adversary's brief, they say on three occasions during the year, they told you or the named plaintiff here that what the rules were and that they were willing to apply if the doctor actually complied, they would provide those additional benefits retroactively. See, with Aetna, it's always one more hoop to jump through. They're going back seven years, after seven years of litigation. Well, it's not a matter of seven years of litigation. Maybe you've given Judge Wood some needles here about how long he took, but that's really not the point. Well, Your Honor, I think it is. The point was at the time, at the time that this was going on, they said this is what it is and all you have to do, we'll give you retroactively. We'll just do this, and he never did, and maybe that's because... You told him not to. Yes, but the key here is the just do this is exactly what he did in January of that year. No, it's not what he did in January. He did not tell them that she had tried the generic brand. No, but she didn't try the generic brand. There's no dispute about that. No, I know, but that's what they said. They said, we want to know whether the generic brand didn't work. And there was no dispute. Well, there was no dispute about what? There was no dispute that she did not try the generic brand. Exactly. Okay, so if he had certified back in August of 2014 that she had not tried the generic brand, they wouldn't have done anything differently. They would have said, oh, no, she didn't try the generic. We're not going to cover it. There was still time. August, there's still about four or five months. Now, I don't quite understand. They told her three times what had to be done. But see, the doctor said that the brand was medically necessary. That's what he said under oath. No one at that time, two years after she had spent weeks in the hospital for depression, was willing to say, oh, here, try this drug, which is equivalent chemically and is made through different processes so that you can make a couple more bucks off the insurance company. No one was prepared to do that with her life. Counsel, this argument has gone on much longer than I had expected. Why don't you summarize your one or two main points? And of course, I'll give Edna extra time should they need it. Thank you. Go ahead. Take a couple of minutes now in summary. Okay. In the other two appeals, there are two issues which the Court should address. One is, what is the out-of-pocket limit for individuals in family plans? Now, it is a red herring as to whether or as to what HHS did in 2015. We're not saying we have any rights under that. We're saying under the ACA, the text and the purpose, more importantly the purpose, provides that an individual in a family plan should get the benefit of the lower amount. Now, the second issue that you have to confront on that is, does the effector XR count toward the out-of-pocket limit? There's two issues there. The first is, was it covered under the policy? Clearly, it was. They said in January of 2014 that they- You are now making a lot of arguments about two and three. You were asked to summarize. Could you please do that? We've read your brief. Okay. Thank you, Your Honor. Unless you have any questions, I- Thank you, counsel. Thank you. We'll hear- and you reserved three minutes for rebuttal. We'll hear from Aetna. And as I said, if you need more than the 15 minutes allowed, I will allow it. Thank you, Your Honor. My name is Evan Young on behalf of Aetna Life Insurance Company. I'll do my best to keep it to the 15, but I would like to answer any questions you have as long as you have them as well. Maybe I can start by saying, in response to the largest part of the discussion that we've just heard, there's nothing wrong with confirming that, in fact, there's a need for the non-generic, the brand drug. And so when the discussion is about whether or not the generic has been tried, whether that would have inevitably led to a denial, two things I'll say. First, we can never know because Aetna cannot be held responsible for something that was never asked. And my friend on the other side literally and expressly told the doctor, do not engage with them anymore, despite being told- Well, he said that Aetna was not really interested in helping. That's- That's correct. And that's a position that I strongly disagree with, that I think that Judge Woods, after holding a three-day trial on this- The basic holding by Judge Wood is that since they were on inquiry notice that there would be this 100-page document, then the fact that there may have been a contract before, which was not filed, doesn't matter, despite New York law, which says you must file one thing at a time so that people don't get confused. So I'd like to get away from this particular plaintiff and ask, what happens if somebody who is an ordinary person, who is not married to a big law firm, who doesn't know what they're doing, who gets a thing which you have agreed was a contract, which says you can get a generic or you can get a brand name, and then you follow up with that three months later with a 100-page contract that no ordinary person is going to read, that says, ah, but you can't do this and you can't do that. And then you find yourself that having done what you thought was OK under the simple contract, you have to pay a huge amount of money. Now, it may be that in situations like this, New York says you're OK, but it may not. And that's my problem. My problem isn't whether these guys knew what they were doing or whether New York might say, given that it's different, that's my issue. And I'd like you to address that. OK. So if I could, Judge Calabresi, I'll address that contract formation issue. And I do want to tie it to where I was headed before, which is the consequence, the idea that, oh, now you're going to be hit with this big penalty. Because I do want to dispute that. I think that it's important that the court understand that what was said about whether or not generic had to have been tried even was required. It wasn't. But let me turn to the New York law issue. I don't think, I respect, I admire, and I even agree with the instinct to allow state courts to decide state law questions when they are determinative. This one, I think, is not, for a host of reasons. First, Judge Corman mentioned section 3201B1, which is a clear New York law requirement that the policy itself has to include all of the things. And there's no dispute in this record that the policy, the February 19th policy, does include everything. There's nothing in the New York law, section 3201 or section 3204, that talks about the timing of that. So now let's talk about the January 9th contract. You can have multiple contracts. The contract, the contractual relationship that was formed on January 9th, was not about providing the policy. It was about three things. It was confirming which policy you were agreeing that you wanted. Is it the bronze? Is it silver? We're putting the silver, the 80-60. Is that the one you want? Not the platinum? Not the gold? Does that. It confirms what the rates are. Is the final rates, the rates that you will pay. Is it the one that we just identified? What does entire contract provision mean? What does it mean when New York says the whole thing has to be given at once? It says that when you have, and this is in 3204A1, that the policy shall contain the entire contract between the parties. So you have one contract that doesn't include the whole thing and another one that does. And the first one isn't valid because it hasn't been filed. No, not at all. I mean, first of all, I will say there is evidence in the record that the rates were on file. The actual January 9th document, of course, was not on file. It could not be the policy. Warner, their broker, testified. Nobody could think that. The one that they had the prior year was submitted to them on January 27th, 2013. I don't think that it was the practice for any insurance company to get the final policy out. But the policy existed. It was approved on October, by October 21st, 2013, I believe. All of the terms were there, all the material terms, which is what the actual policy is about. And the January 9th document was a cause for celebration, not for a lawsuit, because the third thing that it did, in addition to what I mentioned, was to confirm that despite D&S, this law firm, coming very late into the process, we're telling you, Aetna says, you're covered retroactively as of January 1st. This is a reason to uncork the champagne and not to start thinking about lawsuits and class actions about it. Can I ask you, I just want to be sure I heard you right. You said the rates, not necessarily the document, but the actual rates were sent to the State Insurance Commission? That was the testimony? It's not in the appendix. The portions that are in the appendix don't include Mrs. Prybush's testimony, but in the actual testimony she had. Where do we have that on the record? I mean, this is the same question Judge Corman is, I was surprised to hear that because I don't have the things that I read. Yes, I don't have the actual page. I'm happy to send it to the court, but in the transcript that Judge Wood, she was one of the witnesses, she was one of the three witnesses, and in her lengthy testimony, it was a three-day full trial, very impressive. So you have one witness saying this, that it's not undisputed? Well, I don't know whether it is. There is some evidence, at least, that it was. I don't think it matters. I certainly don't want to go off into a rabbit trail of evidence. But that's an important question, because I made a note on the language of the subdivision that talks about rate schedules. It didn't strike me that this document, the final rates document, necessarily had to be filed to comply with the rate schedule, but that as long as the rate schedule was actually on file, that was sufficient. And that's what I thought you said, that the rate schedule, not the document that's called the final rates, was actually on file with the, I forget now, the division of financial services. That's what I understand. I don't have the citation from her testimony. I'm happy to send it in. Could you send in a letter with that citation? Glad to. Yes, absolutely will. But I also wanted to emphasize that regardless of whether that were true or not, the factual findings are absolutely clear that no reasonable person, whether they're married to a prominent lawyer or not, would think that a five-pager, we all know it's the 100-pager. We all have this terrible experience of getting these documents, and as you say, most people don't read the 105. That's why the federal government requires the SBC. The SBC is an eight-page document that also has this information. The formulary, which we were talking about earlier, describes specifically for the prescription drug issue. Where did they get the SBC? The SBC is something that can be found in a number of places, and Judge Woods described this in great detail. Both the broker and the public could go onto websites. There were phone numbers. So they weren't handed a physical copy, but they could access it? They could access online individually, and of course, the plan sponsor has had a responsibility to provide that. There's no question that the broker had access to it. Yes. They have one of these arguments that he really wasn't their broker, and therefore what was available to him and what he knew is not binding on them, which is an argument that I have a problem with, but that's a separate issue. Right. But certainly, as outlined in Judge Woods' opinion, he had access, even I think digital access, to the SBC. And so did the individual? So did the public, for that matter. I'd like to stop at that a moment. Yes. Did Judge Woods rely at all on the fact that the broker might very well, in fact, have been the agent of the plaintiffs rather than the other? Because of course, if the broker was their agent, then it's a totally different case. But I read it as if he said, no, he took, whether correctly or not, that the broker was your agent rather than theirs. I think Judge Woods concluded that, as a matter of law, he was an agent in the sort of agency sense for P&S. Of the insurance companies. I think that this is, to use one of Justice Kagan's phrases, icing on an already frosted cake. I've already dropped a footnote which indicated that he was actually, whatever you want, I don't want to get involved with terms like agent and broker, but that he was actually their, the plaintiff's broker. And from my reading, it's possible in terms of the way things operate in the insurance world for someone to be the agent of both, or the broker for both. And at least according to New York jurisprudence, it's common for the broker, for the insurance company to pay a commission, and that if the insurance company pays a commission, then the broker can't look to the other party to get paid itself. But there's no prohibition on him acting for both. And it seems to me in this case, while he got a commission ultimately, or some form of payment from Aetna, he was quite clearly acting as an agent who was trying to help the law firm that he was dealing with. And he had done it for them the last time. They told him what their needs were. They did not mention anything about drugs and the need for coverage for generic versus non-generic. And it seemed to me that he was really acting for both of them, more essentially for the plaintiff. And I think, correct me if I'm wrong, I think it was a footnote 405 in Judge Wood's opinion where he says that the agents were the plaintiff. That's correct. And that's what I intended to say, that the terminology is a little confusing because we have broker, we have insurance agents versus insurance brokers, and then we have the idea of an agent in the ordinary sense of, you know, master servant, the law of agency, all of that. And that is what he was saying. He was acting for them. And it's true, the way that he was compensated, this is in the portion of his testimony that is in the appendix for this case, was to get, I think, 3%. He said that in years past it had been 10%, and now the insurance companies have reduced that. He could work for any number. This was agreed to by witnesses on both sides. And he did. He supplied them with options from Emblem and Oxford and Aetna and let them pick. He intervened with Aetna on their behalf when, in August of 2014, this problem arose. And he gave them the information that, as you say, wasn't requested back in December or January, but when it became apparent that there was a problem with the prescription drug program, Warner, the broker, the agent for the plaintiff, called Aetna, discovered, here's how you deal with it. You can file this special exception criteria. This is Plaintiff's Exhibit 54. It's not in the appendix, but it's in the record. And this is the document that, it's a one-pager, you can pull it up pretty easily, that says, if you want to not just say, we want this particular non-preferred drug, that's step therapy, but we want to get out from the generic, try generic, choose generic obligation, you have to answer three questions. Have you tried the generic and it didn't work? If you haven't tried the generic, is there a reason to not use the generic? There aren't very many of these. They're chemically identical molecular compounds. One costs $18, one costs $500, but they're the same molecule, so they should work the same. Well, and I'll just, I'll wrap that up. And every once in a while, there is a reason. Is this a different form than the one that was faxed to the doctor? It is a different form. That's correct. So this form requires specific answers to the questions. That's right. These three questions, one page, half of a single eight and a half by 11 page, it requires him to explain why it is that then the vaccine wouldn't be OK at $18 a month, and instead we have to pay $500. If there's a reason, as Mr. Dunnegan's briefs explain, if the doctor says it, and we'll never know what he'll say because Mr. Dunnegan said, close your mouth, stop talking, do not tell Aetna the answer to these questions. If he had answered, and if, who knows, if he had actually said it cannot be the generic, Aetna could not deny that as medically unnecessary unless it had an actual independent medical professional look at it. That is a reason to participate, not a reason to say stop. I don't think Aetna is honest and fair, and I will unilaterally decide that. Instead, as Judge Wood says, let's bring class action in federal court. Instead of filling out one page document, it is not the case that Aetna wants to deprive people of that which is medically necessary. But Aetna certainly has an obligation to the plan and all of its members, and collectively, systematically across the country, if everyone who a doctor writes a brand name, that's often what happens on a prescription, the doctors write the brand name. If everyone just instantly says, well, then that's what I want, $500, instead of $18, you can imagine instantly how that would destroy the ability to provide. Did Aetna have the right to reject the doctor's assertion of why the generic drug would not be appropriate for this patient? Yes, Aetna has the right to determine that which is medically necessary. But in so doing, to not be an arbitrary and capricious decision, it has to refer that to independent medical. But you say we don't get to that at all because of what Aetna furnished and what the doctor didn't say. I'm sorry, I didn't hear the first part of that, Your Honor. Sorry, you say we don't even need to get to that because Aetna gave the doctor the possibility to give an explanation and none was given. That's correct. I mean, one of the things that an ERISA plan administrator that has the fiduciary authority and the discretionary authority that Aetna has is the ability to make reasonable procedures. And Judge Wood said this is a modest administrative step. You said that this could not possibly be arbitrary and capricious under the statute. Because it cannot be an arbitrary and capricious thing to deny something when it's not even asked in the right way. I understand. And so that, maybe we need to go back. I'm not sure if I've answered all your questions about the contract formation. But I will say that there are a host of reasons why the New York law is satisfied, the policy includes it all. Practice in the industry for everyone was these policies never were before. You know, I'll be very frank. I still have a problem with what New York requires under that entire contract provision. But once, if I got by that, all the rest seems to me very easy. ACCA does not apply. ACCA was meant to be prospective only in that respect. I think all the rest is very, as far as I'm concerned, I don't know about the others but the rest to me is very easy. Well, I appreciate that, Your Honor. I think so as well. I also think, however, that this issue is one that there's not very much that the New York Court of Appeals can do that would really be relevant. The actual nature of the inquiry, what the parties had in mind, is something subject to a pretty deferential standard of review. The ability of the district court to rely on settled practice between these actual parties and the conduct that manifested a sense of... No, we have that. You have all of those things. And I think that when you take that together, it's inconceivable that anything the New York Court of Appeals could say about this when we know for sure the January 9th contract could not possibly... That is indeed undisputed. It cannot be the policy that's referred to in Section 3204A1. It cannot be that. It's doing something different, and it's the three things that I mentioned. Everyone knew from the time of the application filed in December that there were additional things. Everyone knew how to get them. Every document that was presented said, if you have questions about the exclusions or limitations, call this number. Write to us. Mr. Dunnigan, testify. I've never yet argued against a witness in the trial, but today is the day. And he testified at trial. I got this thing. I thought there must be more. I checked to see if there's another attachment. Well, there was another attachment, but that doesn't answer the question of whether there's anything more about the policy when the district judge found, as a matter of fact, I think almost a compelled matter of fact, that he knew this could not be, having gotten a 145-page policy the prior year, a month after the start of the year. If there are other questions, I'd be delighted, of course, to answer them. Could you talk to the out-of-pocket limit that was raised by opposing counsel? Yes. I find that very, very difficult. Okay. Yes, Your Honor. So there are two things about this. The first, whether or not the family amount applies. I think that the regulation that's been cited, the 2015 regulation, is quite helpful here, because essentially, Mr. Dunnegan is arguing that this is a Chevron step one issue. Anyone reading the text of the Affordable Care Act must know that there's only one way to resolve that text, and that is the individual has to limit, has to apply, even when it's a family claim. I don't think, I think that if you look at the text of the statute, if there is a Chevron step one outcome, it's probably the opposite one. That's not before the court. That was not challenged. And the government instead said, look, going forward, this is how we want to do it. For families, even if it's a family policy, every individual will meet the individual level, and then we'll start paying 100 percent. Unless they were just interpreting the law, because HHS, when they saw that Congress had wrought, decided that it needed clarification, which is exactly what they called it. They called it clarification. They did this, and I think Judge Sullivan's analysis, it's a very detailed analysis, both in his main opinion and in his opinion on reconsideration. I think the reconsideration one actually goes into a lot, lot more of the detail on this exact, that point. Whatever you, whatever, you know, word of clarification is on there, the way they acted substantively is to fill in gaps or indeed to change the policy in order, as you say, to fix what Congress has wrought. That's why I think it's possible, if it had been challenged, that it would be a very different question. I don't think you can read those words and say that it definitely means what HHS said. HHS might, though, have the authority under Chevron Step 2 to reasonably say, excuse me, that Congress, when it said it cannot exceed this amount, said, well, okay, it can exceed that amount, but the government can make it lower by regulation. That's essentially what happened. And the government said, we are definitely not applying this for prior years, the current years, which they could not have said if what they were saying is, all along it meant this. That's a Chevron Step 1. There's no discretion. So even if it's interpretive, rather than legislative, to use the language that appears in the briefing, you can't cherry pick from that and say it goes back to 2014, because if you believe that it's interpretive, that it's 2016 and forward. Am I right about that? I struggled with this so much. Yeah, I agree that the words that were chosen are unfortunate in some ways. I think we need to go back and just remember the moment and time in which this was happening. This was a chaotic time in which a lot was happening all at once. And our briefing goes into how these agencies were mostly saying, we're not interested in trying to hold people to account. We're trying to make sure that if an insurer, a plan sponsor, the insurer acting in good faith, we're helping them understand how this works. We're ironing things out. We're fixing and filling in the gaps. And this is one of them. Interpretive, legislative. There are a lot of things. As far as statutory schemes go, this is probably one in which the Supreme Court has been considerably more flexible about text than any others. Penalties and taxes, the United States, all that stuff, not relevant here. But the point is, it was a chaotic moment. They were trying to achieve a Herculean thing. The issuers and the insurers were part of that process. And they changed the substantive meaning of the statute, or at least gave it a meaning that it didn't have before, a mandatory meaning. And that is something that unless you conclude, whatever they called it, interpretive, legislative, unless you, the Court of Appeals concludes, no reasonable person can read this after using the tools of textual analysis and statutory interpretation, that all along, from the moment Congress enacted it, it actually meant, despite the language— But you're basically saying that even though they used the word clarificatory, when they said prospective, and then came back a little bit after and said again prospective, because they said prospective when they did it, and then came back and said prospective, that we can only read that as meaning we are reading this prospectively. Here is something that is ambiguous, could be read one way or the other, but we are reading it to be prospective only. That's your argument. That's right. And I think that helps us, Your Honor, because it must mean that they could not have seen it as a Chevron step one issue. That's right. They could be wrong, but they didn't do it that way. Their substantive actions didn't suggest that they thought that was the case. And I would submit that the Court, at most, if looking at the text of the statute, would regard it as ambiguous, at best. And the only argument that can be put forward is there's an S in the word amount in the relevant— Yes, they omit that argument. They put that in their argument, and they say quite dismissively, well, respectively, couldn't possibly be relevant here. I would suggest the opposite. I think the word respectively does an awful lot of work, but particularly in a statute like this that was put forth in such a chaotic time, we have a reason, I think, to trust what the agencies are doing more than— Leaving aside chaotic times, that is essentially what Judge Sullivan did in this case when he read it, isn't it? I'm sorry. Again, I missed the first part of that. Leaving aside talking about chaotic times, but that is essentially what Judge Sullivan did in trying that issue, isn't it? Yes. Yes. And I embrace it. It's all there in his opinion. There's no error in his opinion. He was recognizing— No, I didn't say there's no error. I said it's all there. It's all there. I will add that there's no error, and I won't attribute that to you at this point, although I hope you'll— I would never say that a colleague didn't err. Right. Well, allow me to respectfully suggest that neither of — either your colleague on this court or Judge Wood in the court below made any error that would warrant anything other than affirming. There's no need for a judgment. The judgment in Judge Sullivan's case was to affirm what the plan administrator did on remand. That's the only question. You can't possibly give a judgment to both sides in the case. Okay. Can I ask one last question that has nothing to do with the merits, but I guess at the end of the district court argument, I would ask how much money is at stake, let's say, in Appeal No. 1 and Appeal No. 2? Well— I'm not Judge Sullivan. I'm calling it Appeal No. 2. Yes, Judge Sullivan awarded some attorneys' fees. That's been taken care of. About $115,000 over this $179. No, $64 in that one. Whatever it is. Yeah, exactly. And honestly, that is the answer to why class certification cannot be something that we just— No, no, but how much money are you all arguing? Let's say in the first appeal, 3148, I guess, how much money is involved? Well, so we're talking about $179 in one and $64 in the other, plus potential for attorneys' fees in Judge Woods' case, which he said would be lowered because— No, no, no. If we adopted the plaintiff's argument, how much more money would they get? Oh, I see. Well, probably none because— Well, if you adopt all of it, a couple thousand dollars. Well, if you adopted plaintiff's argument, plaintiff would have the right to certify a class of everyone similarly situated, and we have no idea whether that could be millions, certainly thousands. That's possibly true. I mean, and that's sort of the class. So in the first, like if— setting aside class certification, if we're just talking about these parties, a couple thousand dollars max, assuming you really go the whole run with them. If we go to class certification, it could be more, but I will just— it's not before you. No, it's not before us. We've got enough before us. Let's just leave it— Yes, there's enough issues on this. Thank you, counsel. I'll stop then. I appreciate it. Thank you very much, Your Honor. Mr. Dunnigan, you've reserved three minutes for rebuttal. Tell us about the errors that the two court— the two district judges made, because that's what we're here— we're a court of error, really. The errors. Judge Wood erred in applying 3204 because he misinterpreted scheduled rates on file with the state. Now— What has to be on file? I want to ask you two questions. Does the 3109 have to— rather, the final rates document that we have in the record for the schedule of rates? Your adversary said that there was testimony in the record that the actual schedule of rates was on file. In order to answer your question, I have to back up. I apologize for not answering it directly, but there's an assumption that Your Honor is making. The question is, what is the contract that's going to incorporate additional terms by reference? We think the contract is the January 9th contract. Everyone agrees that is a contract. Now, if you take their premise and the contract is the February 19th 100-page document, then the question is, can you incorporate a schedule of rates by reference from that document into that contract? But the problem with the premise in that argument is that no one agreed to the February 19th document. There was a contract in place. Aetna comes along six weeks later and says, this is your contract. There is no offer. There is no acceptance. There is no consideration. You cannot get that document being the contract between the parties under traditional contract law. And the district judge never said. Can I ask you to answer the question? Was there a schedule of, a table or schedule of rates that was on file? Does the record contain evidence that a table or schedule of rates was actually on file with DES? There is no document showing that that I'm aware of. No, no, evidence. I said evidence. He quoted testimony in the record, which he's going to send a letter giving a citation for. I honestly can't tell you that I remember the trial. I just can't tell you. He may be right. I can't tell you. Well, that's a big issue, isn't it, whether it was on file? No, Your Honor. I don't think it is a big issue. Tell me why. Okay. Because if the schedule, what is the contract referred to under 3204A? Is it January 9th or is it February 19th? If it's January 9th, then it doesn't matter because the schedule of rates, even if it's incorporated by reference into that document, does not pull in the choose generic clause. Now, if by some magic the February 19th document is the contract, well, that has the choose generic clause in it, and we don't have to worry about a schedule of rates. But if the original document was simply a schedule of rates, if the original one was simply a schedule of rates, then that could be that if it was filed, if the rates were filed, if it was... And then the argument that that's all that that was, that that was a schedule of rates, despite the stipulation that it was a contract, which is still a problem. But then if we view that only as a schedule of rates, then the only contract that there could be would be the later 100-page one, and then there isn't a problem with the entire contract clause. So it is important if the rates were filed, because if they were filed, then that could be a filing of rates. See, if the contract... Your Honor, if the contract is the January 19th document, even though no one agreed to it, then we don't have to worry about 3204. 3204 becomes irrelevant, because the choose generic clause is in that February 19th document. But no one agreed to the February 19th document. It just appeared in the mail after the contract was in place, after we had paid two months of premiums to Aetna, after Aetna had provided benefits under the contract, which were covered under the deductible. You can't make a contract with someone, come in six weeks later, and say, well, the terms of this are now this 100-page document, which severely limits your rights. You cannot do that. Okay. All right, continue. Okay. You're going to tell me about the errors, all the errors that the district... Incorporation by reference. Not incorporation by reference. Inquiry notice. There's a problem there, because in every other case involving inquiry notice, the contract which you're referring to has to be clear and obvious to somebody reading the underlying document. Well, if it has to be clear and obvious, what do you need to inquire about? It seems to me the inquiry is because it may not be clear and obvious, but there may be something there that would suggest that you should ask a question. No, I don't think that's right, because like in the subway case from last summer, there were terms and conditions mentioned in the advertisement which point you to a place on the internet where you could see the arbitration process. No, no, what I'm talking about here is the only issue in this case, and the only thing that your client or the plaintiff was concerned about was drugs. I assume he was satisfied that he'd gotten everything else that he wanted, and it seems to me that the plan information on the final rates document requires some inquiry about is my wife's on the formulary? What does in mean? What does out mean? What do these numbers mean? But see, that's not the type of inquiry... What needs to be obvious is to understand this contract. Go look at this page on the internet, which federal law required them to put up, which says this is the form of the actual contract you're going to get. But that was available to your broker. It was. No, no, absolutely not, Your Honor. The form of the contract was not available to anyone. No, the form of the contract, but all of the information that your client was interested in. I'm sorry. I'm sorry. I interrupted you. Go on. Was the choose generic phrase available on what was on the internet? No, absolutely not. That's the point, Your Honor. Federal law requires them, as part of the SPC, to reference a web address where you can get the form. It doesn't have your name filled in, but it's the form of the contract. If they had done that, that would have contained the choose generic clause. If we did that, this would be a very different case. But they didn't comply with federal law in that respect. Well, we are arguing about federal law, but the question is which federal law, because of when the federal law took effect. OK. All right. Continue, and then in closing. OK. The error of Judge Sullivan was to say that the individual limit did not apply. Only the family limit applied. The basis for that error was it only looked at the HHS clarification or guidance from 2015. We're saying if you interpret the statute, if you look at its policy, then you will be able to realize that the additional family limitation is an additional benefit for people. It's not a requirement that every— But if you read that, it is ambiguous. It does not say what you say. It could be read that way. It could be read another way. And what you get is afterwards they're saying we want to read it this way. I agree with you. It's not 100 percent. It's not even clear. It very well could hit ambiguous. But the problem is the fact that a statute is ambiguous doesn't mean that the statute means nothing. It means it needs to be interpreted in light of its policy. The policy here was to reduce costs for individuals and more important—well, equally important, families. So if you work from that policy— Is it arbitrary and capricious for the people to read it in that way? No, Your Honor. The arbitrary and capricious standard deals with the policy. It doesn't deal with interpreting the statute. The statute, they have to get it right. What did Congress intend? Now, did Congress— Look, the Speaker of the House said we'll know what's in this document after it passes. So to talk about congressional intent here is almost a fiction. I think this brings us to a nice conclusion. I think this concludes your argument. Thank you, Your Honor. Thank you both for a very lively argument. You've given us a lot to think about. Thank you. We'll reserve a decision.